**Lydia DONATI, Plaintiff–Appellant,**

v.

**FORD MOTOR COMPANY, GENERAL RETIREMENT PLAN, RETIREMENT COMMITTEE, Defendant–Appellee.**

No. 15–1600.

United States Court of Appeals, Sixth Circuit.

Argued: Jan. 27, 2016.

Decided and Filed: March 1, 2016.*

---

* This decision was originally issued as an "unpublished decision" filed on March 1, 2016. The court has now designated the opinion as one recommended for full-text publication.

ARGUED: Sarah S. Prescott, Deborah Gordon Law, Bloomfield Hills, Michigan, for Appellant. Eugene Scalia, Gibson, Dunn & Crutcher, LLP, Washington, D.C., for Appellee. ON BRIEF: Sarah S. Prescott, Deborah Gordon Law, Bloomfield Hills, Michigan, for Appellant. Eugene Scalia, Jason C. Schwartz, Gibson, Dunn & Crutcher, LLP, Washington, D.C.; Julia Turner Baumhart, Kienbaum Opperwall Hardy & Pelton, P.L.C., Birmingham, Michigan, for Appellee.

Before: BOGGS, GIBBONS, and GRIFFIN, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

When Ford offered to cash out Lydia Donati's retirement benefits for a lump sum, she accepted the opportunity. A few months later, Ford told Donati that it had miscalculated the size of her lump sum. Donati died shortly thereafter, and her daughter sued the Retirement Committee on behalf of her estate for the money Ford originally promised. The district court granted the Committee judgment on all claims and, for the reasons discussed below, we affirm.

### I

Lydia Donati and her husband worked for Ford Motor Company and participated in Ford's General Retirement Plan. After the couple divorced, a Michigan court ordered Donati's ex-husband to redirect a portion of his retirement benefits to her. This was a Qualified Domestic Relations Order (QDRO), as defined by 26 U.S.C. § 414. Donati received those benefits along with her own benefits in the form of a single monthly payment of $1,184.91 from the General Retirement Plan.

In 2012, Ford offered retirees an opportunity to cash out their retirement benefits for a single lump-sum payment. This allowed Ford to reduce its financial volatility and administrative costs, while giving retirees flexibility in managing their retirement funds. In November, Ford sent Donati a letter stating that if she chose to cash out her retirement benefits, her lump-sum payment would be $230,361.49.

After reading the letter, Donati decided to cash out her benefits. In January 2013, Ford sent Donati a letter acknowledging her selection of the cash-out option. In February and March, Ford sent her additional letters stating that her last monthly payment would arrive in April and that her lump-sum payment would arrive the following month.

When April arrived, Ford told Donati that her lump sum had been improperly calculated. Ford claimed that, under the terms of the General Retirement Plan, Donati was entitled to cash out her own retirement benefits, but not those derived from her ex-husband's benefits. In its prior calculation, Ford had mistakenly used both income streams. According to Ford, the correct lump sum for Donati, based on her retirement benefits alone, was $38,840.34.

Less than a month after Ford informed Donati of this mistake, Donati died of cancer. Ford revised the General Retirement Plan in August to include an express provision authorizing people similarly situated to Donati to cash out benefits derived from an ex-spouse under a QDRO. But because Donati passed away in April, her rights

were governed by an earlier version of the Plan, dated March 2013.

■ Donati's daughter filed a benefits claim with the Retirement Committee for $230,361.49, the amount Ford promised Donati. The Committee denied her claim, so she sued the Committee on behalf of her mother's estate, asserting wrongful denial of benefits, 29 U.S.C. § 1132(a)(1)(B), breach of fiduciary duty, *id.* § 1132(a)(3), and equitable estoppel, *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 440 (6th Cir.2010). The district court granted the Committee's motions for judgment on the pleadings on the breach-of-fiduciary-duty claim and summary judgment on the claims for wrongful denial of benefits and equitable estoppel. Donati's daughter appealed and we now review those orders of the district court de novo. *See JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir.2007); *Trs. of Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 590 (6th Cir.2000).

## II

■ *Wrongful Denial of Benefits.* On the wrongful-denial-of-benefits claim, the Committee is entitled to summary judgment if its decision is unambiguously required by the Plan. If the Plan is ambiguous, we ask whether the Committee's decision was arbitrary and capricious, because the Plan gives the Committee discretion to interpret its terms. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Arbitrary-and-capricious review is "extremely deferential" and the "least demanding form of judicial review." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir.2014) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107 (7th Cir.1998)). The Committee's decision must be upheld if it results from a deliberate principled rea-

soning process and is supported by substantial evidence. *Id.* at 1065.

■ The parties agree that the following provision in Appendix L, Section 1, of the General Retirement Plan governs the calculation of Donati's lump-sum payout:

1. A lump sum retirement benefit ... shall be an amount equal to the Actuarial Equivalent lump sum value of the remaining monthly benefits payable, including the following, if applicable:

    (i) Life Income Benefit;

    (ii) Supplemental Allowance and/or Temporary Benefit;

    (iii) survivor's benefit;

    (iv) Special Age 65 Benefit; or

    (v) cancellation of survivorship coverage upon death of spouse.

Plaintiff's first argument is that Donati's income from her ex-husband was part of her "Life Income Benefit." The Plan defines Life Income Benefit as "the portion of the retirement benefits provided in Article VI and in Article VII that continues to be payable, subject to the provisions of the Plan, to a Retired Member during the Member's lifetime." This definition is at odds with Plaintiff's position in two ways.

First, the payments that Donati received from her ex-husband were not provided by Articles VI or VII. Rather, they were provided by Article XII, Section 6, which makes benefits earned by a Ford employee, but assigned to an ex-spouse through a QDRO, payable to the ex-spouse (known as the alternate payee). Given that the benefits from Donati's ex-husband were provided by Article XII, rather than Articles VI or VII, they could not have been a part of her Life Income Benefit.

Second, a retiree's Life Income Benefit only includes "retirement benefits ... payable ... to a Retired Member during the

Member's lifetime." Under Plaintiff's reading of this provision, Donati was the "Retired Member," and her Life Income Benefit included any benefits payable to her during her lifetime. But according to the Plan, the benefits from Donati's ex-husband's account, including those paid out to Donati, were payable during *his* lifetime. Therefore, those payments were not a part of Donati's Life Income Benefit.

Plaintiff responds by arguing that the definition of Life Income Benefit is made "subject to the provisions of the Plan," which opens the door to additional sources of income, such as Article XII income from Donati's ex-husband. However, the words "subject to" only modify the word "payable" in the definition of Life Income Benefit. They do not contradict the unambiguous definition of Life Income Benefit as including only benefits provided by Articles VI and VII that are "payable . . . to a Retired Member during the Member's lifetime."

Plaintiff's next argument is that the phrase "monthly benefits payable" covers the benefits from Donati's ex-husband because those benefits were "payable." But that argument begs the question. This case turns on whether "monthly benefits" is broad enough to cover the payments Donati was receiving from her ex-husband. Plaintiff assumes that these payments were among the "monthly benefits" that could be cashed out, but that is the very point she seeks to prove.

The same problem occurs with Plaintiff's argument that the phrase "monthly benefits payable" "includ[es]" the retiree's Life Income Benefit, leaving open the possibility that unenumerated benefits—such as

payments from Donati's ex-husband—are included. Even if we read the word "including" as illustrative, rather than restrictive, that argument does not touch on the question of whether "monthly benefits" refers to benefits earned by Donati only, or whether it also includes the benefits she received from her ex-husband as an alternate payee.

At best, Plaintiff has established that the words "monthly benefits payable" do not explicitly foreclose her interpretation. But that does not make Plaintiff's interpretation reasonable or permissible. "[T]he fact that the parties offer competing interpretations does not dictate a finding that the provision is ambiguous." *Shelby Cty. Health Care Corp. v. Majestic Star Casino,* 581 F.3d 355, 370 (6th Cir. 2009). The competing interpretation "must be a plausible one." *Zirnhelt v. Mich. Consol. Gas Co.,* 526 F.3d 282, 287 (6th Cir.2008).

Plaintiff's interpretation is not plausible because it potentially subjects the pension plan to double liability. Although we do not have the specific terms of the QDRO in the record, a hypothetical example illustrates this point.[1] Assume that, under the terms of the order, the monthly benefits that Donati was receiving from her ex-husband reverted to him upon her death. In that case, Plaintiff's interpretation would require Ford to pay Donati's estate a lump sum *and* pay Donati's ex-husband the monthly benefits that reverted to him. Even though Donati cashed out, Ford's liability to Donati's ex-husband would remain unchanged. Rather than "cashing out" Donati's benefits, which implies the substitution of a lump sum for future pay-

---

1. Because the QDRO is not in the record, we cannot determine the wording or intent of the Michigan court order. If the Michigan court intended for Donati to get her ex-husband's benefits in perpetuity (that is, even if she died,

or some other contingency occurred), her remedy would be in Michigan state court, to the extent that Mr. Donati, in effect, got a windfall by retrieving his benefits by the terms of the Plan.

ments, Ford would simply be paying out an extra lump sum to Donati's estate. In other words, Ford would be subject to double liability. Such an unreasonable outcome cannot be the result of a plausible interpretation of the Plan.

Plaintiff notes that the Plan drafters knew how to use language expressly excluding parties to a QDRO because they included such a provision in Appendix L, Section 2, which deals with surviving beneficiaries. Plaintiff argues that the lack of such a provision in Section 1 proves that her interpretation is correct. But the absence of express language negating Plaintiff's position does not make it plausible. Indeed, the absence of such language is entirely consistent with the Committee's interpretation. It suggests that such language was unnecessary because the Plan already clearly excluded retirees in Donati's situation from cashing out alternate-payee benefits.

Notwithstanding Ford's unfortunate mistake in promising Donati $230,361.49 as a full settlement of her rights under the General Retirement Plan, the terms of the Plan unambiguously precluded Donati from cashing out the benefits she was deriving from her ex-husband's account under the QDRO. Because the Plan is unambiguous, we need not reach the question of whether the Committee's decision was arbitrary and capricious. We affirm the district court's grant of summary judgment to the Committee on Plaintiff's claim for wrongful denial of benefits.

■ *Breach of Fiduciary Duty*. Plaintiff argues that the district court erred in granting the Committee judgment on the pleadings on her breach-of-fiduciary-duty claim under 29 U.S.C. § 1132(a)(3). In reviewing the district court's decision, we assume all facts in the plaintiff's pleadings to be true, and affirm the district court only if the Committee is clearly entitled to

judgment on the pleadings. See *Winget*, 510 F.3d at 581.

■ The breach-of-fiduciary-duty provision in ERISA is intended to serve "as a safety net" by providing equitable relief for violations that the statute "does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In *Varity*, the Supreme Court allowed plaintiffs to bring a claim for breach of fiduciary duty under § 1132(a)(3) because they were misled into withdrawing from the plan. *Id.* at 515, 116 S.Ct. 1065. The plaintiffs could not sue for wrongful denial of benefits because "they were no longer members of the . . . plan." *Ibid.* The Court therefore allowed them to sue under § 1132(a)(3). Unlike the plaintiffs in *Varity*, the plaintiff in this case can, and has, brought a claim for wrongful denial of benefits under § 1132(a)(1)(B).

■ Since *Varity*, this court has repeatedly held that beneficiaries can bring a claim under § 1132(a)(3) only if they "may not avail themselves of § 1132's other remedies." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir.1998); *see also Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 454 (6th Cir.2003). In deciding whether a plaintiff may bring a claim under § 1132(a)(3), it is essential to look at the "adequacy of relief to redress the claimant's injury, not the nature of the defendant's wrongdoing." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 371 (6th Cir.2015) (en banc); *see also Moss v. Unum Life Ins. Co.*, 495 Fed.Appx. 583, 589–90 (6th Cir.2012).

Here, Plaintiff seeks the exact same relief in both of her claims: the $230,361.49 that Ford originally promised Donati. She does not seek any equitable relief in addition to the money Ford promised. The only difference between her two claims is

the nature of the alleged wrongdoing— misrepresenting the cash-out value of her benefits, as opposed to wrongfully denying her benefits. Under *Rochow*, this distinction alone is insufficient to allow a breach-of-fiduciary-duty claim.

■■ Plaintiff argues that she pleaded her breach-of-fiduciary-duty claim as an alternative to her wrongful-denial-of-benefits claim, but that fact makes no difference. "The deciding factor" in determining whether a plaintiff can state a claim for breach of fiduciary duty under § 1132(a)(3) "is not whether a plaintiff *has* recovered under § 1132(a)(1)(B)" successfully, "but rather, whether a plaintiff *may* recover." *Moss*, 495 Fed.Appx. at 589 (emphasis added). Because Plaintiff's two claims are for the same relief, her breach-of-fiduciary-duty claim is barred by our precedents in *Wilkins*, *Marks*, and *Rochow*.

Plaintiff cites *Hill v. Blue Cross & Blue Shield of Michigan*, 409 F.3d 710, 718 (6th Cir.2005), in which the plaintiffs were allowed to bring claims under both § 1132(a)(1)(B) and § 1132(a)(3). But in *Hill*, the claim under § 1132(a)(1)(B) was for the recovery of benefits allegedly owed to the plaintiffs, while the claim under § 1132(a)(3) was for an injunction mandating the correction of systemic, plan-wide problems. *Ibid.* The two claims sought different forms of relief. Here, Plaintiff does not seek a plan-wide injunction. Both of her claims involve her individual claim for benefits. *Hill* is therefore inapplicable.

Plaintiff also cites *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 (6th Cir.2007), in which a plaintiff was allowed to sue his plan administrator (Liberty) under § 1132(a)(1)(B), and his employer (El Paso) under § 1132(a)(3). While there are similarities between this case and *Gore*, there are also important differences. Gore was allowed

to sue El Paso for breach of fiduciary duty because:

> El Paso cannot be sued under 29 U.S.C. § 1132(a)(1)(B) because Liberty was solely responsible for the denial of benefits. Moreover, the policy clearly states that Liberty is the proper party in a denial of benefits case. The question would be different had Gore brought his misrepresentation claim under 29 U.S.C. § 1132(a)(3) for breach of fiduciary duty based on a misrepresentation by Liberty, the fiduciary who controlled the claims. However, in this case the § 1132(a)(3) action based on misrepresentation was brought against a fiduciary, El Paso, who did not control the claims. Thus, Gore properly brought his claim of misrepresentation [against El Paso] under § 1132(a)(3)....

477 F.3d at 842. Key to the panel's decision was the fact that the plaintiff's breach-of-fiduciary-duty claim was against a defendant whom the plaintiff could not sue for wrongful denial of benefits. If a plaintiff tried to bring a wrongful-denial-of-benefits claim *and* a breach-of-fiduciary-duty claim against the *same* defendant, the outcome "would be different." *Ibid.* The district court correctly held that *Gore* does not apply because Plaintiff's claims are against the same defendant for the same relief. Plaintiff's breach-of-fiduciary-duty claim impermissibly repackages her wrongful-denial-of-benefits claim, and for that reason, we affirm the district court's grant of judgment to the Committee on Plaintiff's breach-of-fiduciary-duty claim.

■■ Equitable Estoppel. Plaintiff's estoppel claim runs into difficulty because her claim for $230,361.49 is foreclosed by the unambiguous language of the Plan. Principles of estoppel "cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provi-

sions." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 404 (6th Cir.1998) (en banc).

 This court has carved out a narrow exception to the *Sprague* rule in cases where the plaintiff can show "(1) a written representation; (2) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (3) extraordinary circumstances in which the balance of equities strongly favors the application of estoppel," in addition to "the traditional elements of estoppel, including that the defendant engaged in intended deception or such gross negligence as to amount to constructive fraud." *Bloemker*, 605 F.3d at 444.

The exception established in *Bloemker* does not apply here because the circumstances are not extraordinary. In that case, Bloemker was told that he would get $2,339.47 per month for the rest of his life if he retired early. *Id.* at 439. Bloemker retired early based on this information, only to receive a letter stating that his benefits were miscalculated and that he was entitled to only $1,829.71 per month. *Ibid.* Bloemker relied on the larger figure in deciding to retire early, and was faced with a very significant decrease in his pension income, as well as a demand for repayment of $11,215.16. *Ibid.* Here, the Committee's miscalculation of benefits did not detrimentally induce Donati to make a decision that she would not have otherwise made. Donati was, tragically, dying of cancer, and she probably elected to cash out her benefits because it was financially advantageous to do so. That option would have been attractive regardless of whether the correct sum was $38,840.34 or $230,361.49. *Bloemker* is therefore inapplicable.

Plaintiff argues that Donati "expended considerable energy evaluating her situation, discussing with Ford representatives what her options were, and ensuring that paperwork would be completed accurately to ensure her pension would be paid out properly." However, in *Haviland v. Metropolitan Life Insurance Co.*, this court held that the circumstances were not extraordinary when "MetLife falsely promised that [the plaintiffs'] continuing life insurance benefits would not be reduced for the rest of their lives, when in fact their benefits were reduced to $10,000," and "these false promises affected the plaintiffs' retirement and estate planning decisions." 730 F.3d 563, 567, 569 (6th Cir.2013). *Haviland* established that mere reliance on misinformation in estate planning does not rise to the level of the extraordinary circumstances contemplated by *Bloemker*. Because the circumstances in this case are not extraordinary, we affirm the district court's grant of summary judgment to the Committee.

### III

We AFFIRM the district court's grant of judgment to the Committee on all three claims.